We're going to take a break after the next two cases, after Gordon and Deglantier. So the Ruby case, which is last in the calendar, will show up, we'll hear that after the break, if the Council can plan. Yes. How are you? Bill Rutzek, Attorney Matter. Keeping in mind the Court's admonition, I would nevertheless like to potentially reserve two minutes for rebuttal. Well, my admonition is that you've got whatever is left on the clock, and it's all yours. So if you want time to dig yourself in afterwards, just leave time on the clock. Thank you, Your Honor. Oh, Osarjuk, which is a recently, a case that I recently supplied the Court, Osarjuk v. Associated Universities. That's the New York case. That's a new one, 36. I'm sorry. I know the site. I just want to make sure you're, I couldn't pronounce the name. I just want to make sure I'm looking at the same New York case you're looking at. I called up the lawyer because I wanted to pronounce it right. Okay. I believe directly supports Plato's position that the Price-Anderson Act amendments don't preempt a claim for a non-radiological or non-radioactive. It directly supports your claim. I'm just trying to figure out the implications. Maybe I'm oversimplifying. But it seems that on the one hand, if one element, mercury, is in an otherwise clearly nuclear batch of material so that you have one element, you're saying that that one element can then trigger all of the kinds of liabilities that presumably the Porter-Anderson Act was enacted to control and bring under exclusive federal jurisdiction. And on the other hand, your concern is if there's only a tiny piece of nuclear material in the batch of materials and a whole bunch of non-nuclear hazardous waste in the materials, it has the effect of robbing plaintiffs of state remedies because fortuitously there was at least some nuclear element to the batch of materials. Which would be the result of if we decide, if we disagree with the New York current law. Well, the way I see the Osagic case dividing the baby, I guess literally, is it's separating the two components. I know it is. I'm just saying the effect of that is to create a rule that the Nuclear Act, designed to protect the nuclear industry, you get an end run. If there's any item that you claim causes damage, even if it's 1% of the 99% mix, as to the mercury. I don't think that was the intent of the Price-Anderson Act, and let me explain why. All of the cases, I shouldn't say that, I cited a bunch of cases, including Roberts v. the Florida Power case and a number of others. They talk in terms of radiation injury, and what they say, the standard of, to win a case under the Price-Anderson Act, you have to show that you go over radiation of a certain amount. That's literally the way you win. In other words, the federal regulations, and they're referenced in these various cases, you have to be, I'll make it up, but 10 milligrams of radiation in a certain period of time. What the Price-Anderson Act was trying to do was to protect, well, it was to balance things. It was to help people who are hurt, but it was also to protect the industry because of the unique and potentially very extensive consequences of radioactivity. So if you don't allege any radiation injury and you just bring a claim for mercury poisoning, in this case, then that aspect goes forward and none of the policy implications of Price-Anderson are implicated. That's correct. You didn't bring the claim that way, did you? We brought the claim entirely under state law. To make it clear, it wasn't brought under Price-Anderson at all. It was later removed. The question is, did you isolate on mercury in your state claim? The complaint says there was both radioactive and non-radioactive. Right. So as soon as you allege radiation, by your own analysis, you are within the scope of Price-Anderson. Only with respect to the radiation. Well, it may be, but you're saying that then what happens to the radiation? You conceded that it can't go under. The way the evidence developed and the proof is essentially that the proof was all for heavy metals and non-radiologic things. Well, what do we do with it? This is a jurisdictional question, isn't it? Our court has held that it's exclusive jurisdiction if it is under the Price-Anderson Act. And it doesn't reach emotional distress and it doesn't reach medical monitoring. But it's only jurisdictional with respect to a nuclear incident. Well, let me ask this. How many incidents were there? There was one incident. There was one incident. Okay. And so let's look at what the Price-Anderson Act describes as a nuclear incident. There's one incident. It describes what a nuclear incident is. And it would seem to describe this event as a nuclear incident because it involved nuclear materials. And so if there's one incident and that incident is described as a nuclear incident under the Price-Anderson Act, it seems to me the Price-Anderson Act applies and you can't break it out as you've done. Well, but the Osage case precisely breaks it out. And that's one of the reasons I thought it was relevant because in that case, if the Court recalls the State Supreme Court had dismissed both the radiological and the heavy metals and other things, the appellate division affirmed the dismissal with regard to radiologic but reversed it for the heavy metals and other things. So it makes exactly the distinction. And what I'm saying is that distinction makes sense because it is, I would submit, inconceivable that Congress, and I'm making this up but it's not totally implausible, if there was a release of a poisonous gas that, and that's your example, that was 1% had some radiological components and 99% strychnine or something that killed people that had nothing to do with radiation. And therefore, you don't meet the test. Let's say we buy this argument. What does that buy you? What it buys you is what it buys me. It doesn't buy us anything. What does it give you? It gives us the state law claim, which means that, as this Court acknowledged in In re Berg, the Whaley v. State case and other Washington State cases permits a, pardon me, permits a tort action even if the only claim is mental compensation. How about just a short declarative sentence? How about just a sentence, you know, that's less than 15 words long? Tell me what that buys you. It buys us all the claims based on the anxiety. Emotional distress. Emotional distress. Okay. That's what it gives you. Yes, because it gives us state law. That's fine. Okay. Do you want to argue anything about the remaining claims? I do. Okay. You've got your causation problem as to the causation problem. Yes. Let me deal. I'll deal with it. There's two elements. The reason I was scaring you is you used up almost half your time, and although I'm sure the emotional distress claim is important to you, I think the rest of it is a bigger part of your case. And I thought you might want to get onto that. I appreciate that. Let me divide the causation thing as did the district court into general and then specific causation. The relevant criteria. Your problem is going to be specific causation. Let me tell you. All right. The more serious problem is going to be specific causation. Well, let me deal with that directly. I mean, it's going to be the more difficult problem for sure. Let me deal with that. And then if I have a minute, I'll talk about general causation. Okay. This is not, in my mind, an ER 703 or a Daubert issue because all of the evidence was considered by the court. The district court specifically stated that he was denying all of the motions. Your problem is that your expert said, this is Dr. Wilkinson, said he can't pinpoint it. He has no way of knowing whether any of these symptoms were related to this incident. I'm not sure. Can I prove it? I can't prove it. Anytime you have people with chronic illnesses, there's little you can do to prove it. There's little that you can prove. I'm a clinician. You know, I try to make my patients feel better. I mean, they'll get better, right? When I was a lawyer and the opposing expert said that in deposition, I went home and said, we won. Well, let me he said it in deposition, but there was additional evidence. And the record I submit is clear on that. He gave a declaration afterwards, which is at, I quoted it on pages 9 and 10 of my initial brief, but it's at ER 228 and 230. To what? It's ER pages 228 through page 330. I also quoted. 330 or 230. I'm sorry. 230, right? Yes. 228 to 230. Yes. Richard Wongers. Okay. Declaration afterwards. Okay? Yes. And paragraph 6, and this was after his deposition, and I'll tell you specifically what additional information he had. He says, in my opinion, Mr. Goldman has had adverse health effects caused by or exacerbated by those exposures and those exposures are the exposures about which we've been talking. He gives four bases for the opinion. The last basis has to do with the number of the symptoms got better after his treatment for heavy metal detoxification. And he goes through and he talks about how he gave the processes called chelation, in which you remove heavy metals, and he says the symptoms improved after that. Mr. Goldman, and I don't have the site, but Mr. Goldman also says it was better after the chelation. That information. Why does that help you? I mean, he also, I mean, he might have been accumulating heavy metals. He's been working there for a while, right? Yes. So he might have had chronic accumulation of heavy metals because of his work. The Dr. Wilkinson equated it, among other things, with the particular exposure at issue. My point is that the deposition excerpt that he was reading was not the final word on the subject. He, Dr. Wilkinson, had additional information after the deposition. And so in my mind, it is his declaration, which was subsequent, which provides the last word on the subject and supersedes our main point. The problem with this, you know, the only thing that helps you in here, really, is third, many of his symptoms either occurred, this is on page 230, this is paragraph 6, third, many of his symptoms either occurred or became exacerbated after the acute exposure, which strikes me as just a conclusion. You know, there's no science involved there. You know, the patient comes in and says, my symptoms got worse after this event. This is not an expert kind of thing. Well, I think you'd have to dispute, Your Honor. It's not scientific in perhaps the classical way, but it is what treating doctors do. I mean, that is, I would submit, kind of a basic part of what treating doctors do. If you come in with symptoms and you do something and you get better, that's both observable either by questioning the patient or observing it yourself. It's a way of getting hearsay. That's what it sounds like to me. But this is an expert. But let's talk about detoxification. Yes. This is the process. He says, look, I gave him this process and he felt better after it, right? Well, it was stronger than that. His symptoms, because his symptoms involve shaking, which is observable, so it's not simply he said he's better. But he was better both in terms of what he said and also, I guess you'd call it objectively, his hands weren't trembling, which I submit is an objective. But how does that tell us that the thing he was being detoxified for was the result of the spill? I mean, he could have gotten it somewhere else. He could have gotten it from years of exposure in his job. I mean, let's say, in fact, the treatment does detoxify him or take metal out, right? How does that tell us that the metal that's being taken out got into him as a result of this incident? Well, we know that a lot of it, at least we know from what Dr. Wilkinson says, that when he talks about the part you read about his symptoms got worse or began after his acute exposure, a very fair inference of that is that there is some connection between it. And in the new Clarissa case, which is a 339F3rd, this Court has followed. I'm sorry. That's the Oysterbed case. Oysterbed case. That a – Wait. What did you say the case? The new – The Oyster case is Claussen? I'm sorry. It's Claussen versus new Clarissa. Oh, I'm sorry. It's the same case. I'm sorry. It's a 339F3rd, but it's the same case. There they said that a temporal relation can't serve as a basis for analysis. And more than – so you have the temporal relationship in terms of it being caused. And this – I cited portions of the Federal Handbook on Scientific Method, where they talk about a standard method of analysis in treating people. They talk about you remove the person from the offending substance and see if the person gets better. Analytically, there's no difference between removing the person from the offending substance and removing the offending substance from the person. It's the same analysis. Did he also stop – did he keep working on his drug? He did. Yes, he kept working. I think it has impacted him, but not to the extent of his being unable to work. He did not keep – did or did not? He continued to work. He didn't work overtime anymore, and he was sick more. But he continued to be employed. And so, yes, he continued to work, just not at the same level as he had. Mr. Rutzick, I want to ask a question about expert testimony. You seem to be saying that after he gives the deposition and I go home and say I won, eh, he can come up with other information. And I want to know on what – I think that's contrary to the law, unless he's got a good reason. And I wonder why he came up with other information later. And on a different expert question, I do not believe that Anderish was properly designated to be a causation expert. So focus briefly on the expert issues. Okay. On the first point, it was not – he came back and thought better of it. Several months took – occurred. In other words, deposition was a time period when – I can't give you the exact time, but it was several months before the declaration. Just because Mr. Golden is his patient, he came back and he did stuff. So it wasn't done to change the rules. He's a treating doctor, and he testifies about that in the declaration. It just happened. Just to point out – and this was all admitted. So it's not like – it's in the record in the Botheas case, which I cited. It's a Ninth Circuit case. Talks about the standard once things are in the record. Let me address your second point, which allows me to segue into general causation as well, because the Anders thing is primarily involved with general causation. I – SRE 075 is her designation, and I will read it. It says, Laurie Johns Anders is an industrial hygienist. Ms. Johns Anders will testify regarding the subjects, facts, information, and opinions as set forth in her deposition testimony, in this case taken on December 1, 2004. And I can call – refer the Court to excerpts of that December 1, 2004 deposition, which is ER 83 through 94. But the key point here is the designation took place after the deposition. Yes. Yes. And the reason I'm citing those is those are causation opinions. And therefore, I would submit there is – anybody who reads that and then looks at the deposition would say, among other things, she gave causation opinions. And – and – Do you want to save half a minute for a moment? I'll save half a minute for everybody. Thank you, Your Honor. Good morning. My name is Tom Hyden, and I'm here on behalf of CH2M Hill. And with me is my partner, Mayor Rose Alexander, who was once privileged to work for this court, and also Stan Benson, who is the chief counsel for CH2M Hill. Given the questions from the panel, I think I'd like to start with specific causation. Well, before you do, can I just understand this tradeoff, which I – again, maybe I'm oversimplifying, but it seems to me a little strange that if there is a nuclear component to an otherwise bath of – is that everything gets swept under the Price-Anderson Act if there is some element of radiation in it, even if it's only 1 percent of the mix. And that knocks out all of the things that would normally be available if there wasn't just that one limited 1 percent radiology component. Why should Congress be overstepping onto normal state hazardous waste tort law just because there's one radiation element? I understand it if the formula is the other direction, where the non-radiological heavy metal is the 1 percent and everything is basically radiation. But how do you respond to that? I think the answer to that, Judge, is that actually the Price-Anderson Act doesn't erase any of the state law claims except one element of one state law claim. And the Price-Anderson Act specifically says that state law will control for all matters of substance, affirmatively and defensively, unless inconsistent with the provisions of the Price-Anderson Act. And here, that only affects plaintiff's emotional distress claim because the Price-Anderson Act, by its plain reading, and in Ray Berg and other cases, say that the Price-Anderson Act does not permit recovery for emotional distress but only for bodily injury. Well, emotional distress from damage caused by radiation. But what if somebody drops a uranium block on somebody's foot? He says, you know, they dropped the uranium on my foot and crushed my toes. Is that preempted? No, clearly it's not preempted. Well, how is that different here? If a uranium block is dropped on my toe, then I have all of my rights to claim for every piece of damage and injury under the Price-Anderson Act and under the state law. So you'd have to go under the Price-Anderson Act? You couldn't just bring a state law claim for dropping a heavy object on somebody's foot because the heavy object happens to be uranium? Really? Is that your position? No, that is not my position. And there is not exclusive jurisdiction in the federal courts. A lot of these cases, in fact, have been tried and litigated in the state law. He's saying there was a stuff spilled all over me. I suffered emotional distress. And what I suffered emotional distress was the fact that this bunch of heavy metals, liquid, spilled all over me. Also, I did have some uranium. But I'm not distressed about that. Uranium made me happy. I'm distressed about the heavy metals. Maybe that would be the difference. If he had come in and said that the only thing that I was emotionally distressed by were all of the chemicals. You don't want to walk away from me like that. All of the chemicals and toxins which were not radiological or not radioactive. That would be one thing. Here, however, he has done exactly the opposite. And he has pleaded by lumping all of these together and said that. I'm sorry. Where are you from? Do you have a complaint? In his complaint. Yes. Show me what. Plaintiff, this is ER 11 and ER 12. Okay. And it's also in the answers to his interrogatories. Defendant is responsible for storing and retrieving. This is paragraph 3.1 and 3.3. Storing and retrieving. I'm sorry. ER, not SRE. No, maybe I misspoke. ER 11. It is ER. Yeah, that's fine. I was just looking at the wrong volume. Go ahead. Storing and retrieving approximately 53 million gallons of highly radioactive and hazardous waste. Clearly, that allegation brings it under the Price-Anderson Act. The part that says radioactive does, but why the hazardous waste part? I mean, we can just simply cross out the part that says radioactive, and he still has hazardous waste. Which paragraph are you reading from? I was reading from 3.1. Okay. He goes on in 3.3 to say that the tank, that is the tank containing the liquid that splashed, held a mixture of liquid waste that includes radiological materials and hazardous chemicals. So what? That's actually 3.2. Oh, I'm sorry. You don't have it in front of you there? No, I have an excerpt from it. That's okay. And then he goes on in 3.3 and repeats it. So why isn't there a remedy for that to say, okay, we're not going to let you talk at all about the fact that the stuff had radioactive stuff in it, but you can talk all you want about the fact that this had nasty other things in it, other nasty things. So we'll strike the portions of the allegations that deal with radioactive, the fact that the thing was radioactive, and leave the rest in. Because the Price-Anderson Act doesn't make any such distinction, and the Price-Anderson Act specifically does not make any such split. So what you're saying then is, coming back to my, that was why I asked my question at the front end. As long as, if the only radiation in this mix that he's alleged was 1% of the total, and going with Judge Kaczynski's motion to strike approach, you say they can't do it, because as long as there was 1% in there, that subsumes the entirety of the materials. That's correct, and I think that is consistent with the plain language. So if he falls in, and he drowns in it, and he says it was radioactive liquid, bam. That's a Price-Anderson claim, you're out. You can't bring a state law claim. To the contrary, he's not out at all. He has all of his rights for all recovery for all bodily injury or death under the Price-Anderson Act, and... I don't think you heard my question. It's probably because I mumbled. But he's out in terms of state law. His recovery is limited to the Price-Anderson Act. He drowns, he falls in this big vat of liquid, and when they fish him out, it turns out the reason he dies is because he had all those heavy metals and things, and got stuck in his throat, and he drowned. He's out because the liquid happened to be radioactive. He's out in that respect. In terms of state law. But he is in under the Price-Anderson Act, which expressly incorporates all state law standards and remedies, unless they are prohibited by the Price-Anderson Act. I'm sorry, what is it in the Price-Anderson Act that you say reads so broadly? Section 3Q. Q as in? What does it say? It says the term nuclear incident, has to be a nuclear incident in order to come under the Price-Anderson Act, means any occurrence, including an extraordinary nuclear occurrence, which causes bodily injury, sickness, disease, or death, or loss of or damage to property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct. I'm sorry, is the fact that water, you can't breathe through water, and if you sink in it, you drown, is that becomes a, which is it? Is that a radio, what kind of effect is that? Well, if that meets the definition of a nuclear incident. Well, it's fine. Let's talk about that. He drowns in a vat of liquid that's radioactive. Are you saying that's covered by the Price-Anderson Act? Why don't you walk me through, explain to me which language in that act, as you read it, would cover that? Same language. You're probably just shaking his head. If it meets the definitions of source, special nuclear, or byproduct material. No, no, just talk to me in English. Okay. Tell me which, okay, the guy drowns in a vat of radioactive water. I mean, he just drowns. He falls in, he can't swim, he drowns. Water enters his lungs, he can't breathe. And you say that's covered by, that's preempted by Price-Anderson. Just walk me through. Tell me the language which would cause you to get a preemption. If that material met the statutory definition. No, no, not if. Just tell me the statutory language that you would use in order to succeed in a claim that that claim, that the state law claim for drowning is preempted. Just tell me the actual language, the words of the statute that you would use to win that argument. Same language that I just read to you. I don't remember it. Okay. I'm sorry. Just use the words of the statute. Nuclear incident arising out of or resulting from radioactive, toxic, or other hazardous properties of source. So is a drowning a hazardous, a toxic, which property, which one is it of those? The fact that a guy drowns in a vat of radioactive liquid, is that a radioactive property of the water? Is a drowning the result of a radioactive property or is it the result of a toxic property? Which one is it? Tell me. If it is. Not if. Tell me which one it is. That radioactive material would either be source material, which is defined in the statute as uranium, for instance. He drowns in it. It's water that has radioactive qualities in it, right? And he dies because he drowns. You understand what drowning means? Absolutely. Okay. You understand the concept? Yes, I do. Okay. You don't get any air. The water gets into your lungs. You don't have any time to get radiation sick or anything else because you're dead before that can happen to you. Correct. Okay. Is that a radioactive quality of the water that killed him? Is that toxic quality of the water that killed him? Which is it? Which one in the statute do you hang your hand on? Your partners look like they want to help you. You can feel free to confer with them if you want. If he dies because of the radioactive property of the water, it's covered by the water. You know, you're changing my hypothetical. I really don't like it when lawyers do that. He dies because he drowns. Okay? He drowns. He falls in it. The water's radioactive. He goes, glug, glug, glug, glug, glug, and he drowns. Do you get the picture? I have the picture. Okay. I'm not a good swimmer. I have that picture. Well, then, let's take the uranium block falls on his head. He drowns because it's heavy and hit his head. If he drowned because of something that had nothing to do with any radioactive or radiological property of the material, then it would not be, in that hypothetical case, covered by the Price-Anderson Act. Now, let me understand your argument, then, because I've been trying to follow it, and you seem to be – you said right off the bat it was a nuclear incident. If it is a nuclear incident, means any occurrence, including an extraordinary nuke, blah, blah, blah, then you get, for bodily injury, sickness, disease, or death, or so on and so forth, arising out of or resulting from the radioactive toxic explosive. Now you're into the causation aspect. Your answer is now saying if it's not caused by – but you said at the beginning that it was a nuclear incident. So do we define – do you first of all have to define whether it's a nuclear incident? And is it a nuclear incident if you fall into a vat of nuclear or radioactive material? Or is it not a nuclear incident if what the cause of death, the specific cause of death, unambiguously, is suffocation by inhalation of a liquid? I think the answer to your first question is yes, and I think the answer to your second question is yes. So it is a nuclear incident in which the drowning was caused by suffocation. It had nothing to do with the radioactive aspect of it. It just had to be, as Judge Kaczynski well put it, because you ran out of air. I think the answer to the second question is that that would not be covered by the Price-Anderson Act. I think the answer to – That is the damage would not – the damage, what, you would have to then – it would be – You would have your right to sue it in the state court under – Even though it was a nuclear incident. It's – Yeah, I think you've just given up on this point. I think you just gave up. Because once you say that, you're claiming, look, why not – the thing spilled on us. Maybe it was a nuclear incident. Maybe it wasn't. But we're not claiming any damage from the fact that it got spilled with radioactive liquid. We claim emotional harm from having been sprayed with other things, with heavy metal, with mercury, with – I forget what those other metals are. And then wouldn't his problem – wouldn't then – your defense would then be, would it not – so I understand how this plays out. Your defense would be, if the motion to strike is granted or they replete and they follow the New York case and they say, we have – I was splashed by materials partly nuclear, radioactive, partly not. Our claim is for the mercury only. And then you would be arguing presumably against their ability to prove at trial that it was the mercury who was causing – that was causing the symptoms and so on. No. No, to the contrary. He has all of his rights at state law for all of his bodily injury. All of his bodily injury claims about all these symptoms have nothing to do – No, but he doesn't care about having all of his rights. He wants to have all of his rights under state law to get emotional distress. He gets the damages. I understand. But what you're trying to say is you can block him at this stage under our decision in Byrd that he doesn't get emotional distress and he doesn't get medical monitoring. What he wants is the state law claim to say that if I get hit with mercury and I can prove emotional distress from mercury or the fear of mercury poisoning that's going to play out in the future. I don't know whether it succeeds on the merits, but that's his theory. And I am not foreclosed by the Price-Anderson Act from getting emotional distress with medical monitoring. That's what he wants. That might be what he wants. But what he pleaded – I understand what he pleaded. Then can he – did he seek leave to amend? First, he said that his anxiety and his fear – No, did they seek leave to amend? They did not seek leave to amend. They never sought leave to amend. And I think the reason for that is there was a decision made back then. I don't know what the reason is. They didn't seek leave to amend. No, they did not. And they wanted to lump all this together. And he said that he began experiencing anxiety about being exposed to chemicals, neurotoxins, heavy metals, as well as radiation. Right, so now he takes – all he can recover for under state law is emotional distress to the extent it was caused by anything other than radiation. And if he can't make the separation, then you would argue that he loses. He's foreclosed by the Price-Anderson Act. He can't prove that it was just limited. He can't prove any emotional distress that flows strictly and isolatably from the mercury as opposed to anything else. Well, we make two different arguments, that there is no such distinction made under the Price-Anderson Act. This case arises under the Price-Anderson Act. And that – Then you're coming back. It is a nuclear incident. Absolutely it's a nuclear incident. You already gave that one up about five minutes ago. He did that it is a nuclear incident over and over again, four times in his complaint and four times in his interrogatory answers, by mixing together his allegations that his emotional problems and his physical problems were caused by this laundry list of radiological and non-radiological. Well, you can't – why can't you go back in a minute and why don't we just simply strike the reference to radiological? Say, you know, he had injury because of this and this. Well, all references to radiological injury are struck, and he goes forward with the rest of it. Very simple. Because I don't think that the plain language of the Act permits that, and I don't think that the plain language of his pleading, at least in front of this Court, permits that either. You haven't persuaded me of that. If we look at congressional intent, aren't they interested in protecting the nuclear industry, and does that not suggest we should separate out things that aren't a threat to the nuclear industry? Well, under the amended Price-Anderson Act and under the Nuclear Waste Policy Act, the Congress decided that it wanted to make it clear that not only were the things that we have talked about, if nuclear incidents covered under the Price-Anderson Act, but also in the Nuclear Waste Policy Act, specifically provided that what is being done at Hanford, that is the handling of high-level nuclear waste, would in itself be governed by the Price-Anderson Act, and did that in 42 U.S.C. 2014, the amendments to the Atomic Energy Act, and in the Nuclear Waste Policy Act, 42 U.S.C. 101.1. So clearly the Congress had decided that it wanted to be sure that the activities at these sites, which involved the handling of reprocessed fuel and the liquid waste from that reprocessed fuel, were all covered by the Price-Anderson Act. Okay, thank you. Maybe next time we'll get to hear from Ms. Alexander. Make more headway that way. Aha, a wise man at last. Cases are used and submitted. We'll next hear argument in DeMaurier.
judges: Kozinski, Fisher, Guilford